IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Tesoro High Plains Pipeline Company, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>United States of America; United States Department of the Interior; United States Bureau of Indian Affairs, as part of the United States Department of the Interior,<br><br>Defendants. | Case No. 1:21-cv-90 |

## ORDER GRANTING MOTION FOR PRELIMINARY INJUCTION AND DENYING MOTION TO INTERVENE

### INTRODUCTION

[¶1]   THIS MATTER comes before the Court on a Motion for Preliminary Injunction filed on June 11, 2021, by Plaintiff Tesoro High Plains Pipeline Company, LLC ("Tesoro"). Doc. No. 3. The Defendants filed their Response on February 1, 2022. Doc. No. 27. Tesoro filed a Reply on February 22, 2022. Doc. No. 33. A Status Conference was held on September 22, 2022. Doc. No. 60. At the hearing the Court was informed Tesoro intended to file a Motion to Dismiss the United States' Counterclaim. Id. at p. 8. There was also a pending Motion to Intervene at the time of the Status Conference. See Doc. No. 16. On August 8, 2023, the Court denied the Motion to Intervene. Doc. No. 67. On November 8, 2023, the Court denied without prejudice the Tesoro's Motion to Dismiss the United States Counterclaim, and granted Tesoro's alternative Motions to Sever the Counterclaim and Stay the proceedings as it relates to the Counterclaim pending the resolution of

the underlying administrative claims. Doc. No. 71. For the reasons set forth below, Tesoro's Motion for Preliminary Injunction is **GRANTED**.

[¶2] Also before the Court is a Motion to Intervene filed by the proposed Intervenors on January 9, 2024. Doc. No. 78. Tesoro and the Defendants filed Responses on January 29, 2024. Doc. Nos. 81, 82. The Intervenors filed a Reply on February 5, 2024. Doc. No. 83. Because the Motion to Intervene is essentially duplicative of the previous Motion to Intervene that was denied, this Motion to Intervene is likewise **DENIED**.

## BACKGROUND

[¶3] Tesoro owns the High Plains Pipeline System ("Pipeline"), which transports oil throughout the Bakken Region. Doc. No. 1, ¶ 43. Relevant here, a 15-mile segment of the Pipeline crossing the southwest corner of Indian trust lands within the MHA[1] Nation Fort Berthold Reservation. Id. at ¶ 44. The Pipeline crosses ten (10) tracts of land owned by the United States for the benefit of the MHA Nation and thirty-four (34) tracts of land owned by the United States, in part, for the benefit of individual tribal member allottees, and in part, for the benefit of the MHA Nation. Id. at ¶ 44. Rights-of-way for the Pipeline cover less than ninety-one (91) acres across these tracts while the Pipeline itself only occupies a small area within the rights-of-way. Id. at ¶ 45.

[¶4] On September 18, 1953, and on behalf of the allottees and the Tribe, the Superintendent for the BIA's Forth Berthold Agency executed a 20-year Grant of Easement for Right of Way for the Pipeline, which began operating that year. Id. at ¶ 46. Renewals of the Grant of Easement for Right of Way occurred on June 18, 1973, and June 18, 1993. Id. at ¶ 46. Tesoro approached the MHA Nation and the BIA[2] in 2013 to negotiate the renewal of the 1993 right-of-way. Id. at ¶ 47.

---

[1] Mandan, Hidatsa, and Arikara.
[2] Bureau of Indian Affairs.

The MHA Tribal Chairman instructed Tesoro at the time it should not approach individual tribal members until negotiations for tribally owned land was complete and the MHA Nation had time to review Tesoro's safety record. Id. at ¶ 47.

[¶5]    In 2014, Tesoro undertook steps to secure appraisals of each of the 44 tracts of land, knowing it was required by BIA regulations to secure federally approved appraisals prior to negotiating a renewal with individual allottees. Id. at ¶ 49. In accordance with the Office of the Special Trustee's Appraisal Services ("OST"), Tesoro obtained an independent licensed appraisal of the tracts of land, which was eventually completed in 2014 and updated in 2016. Id. The BIA failed to obtain OST review or approve the appraisals and updates. Id. In 2017, the MHA Nation and Tesoro entered into an agreement for an approximately twenty-eight (28) year renewed right-of-way. Id. at ¶ 48. The renewed right-of-way covered all the Tribe's interests in the forty-four (44) tracts at issue, which included ten tribal tracts and fifteen additional tracts to which the Tribe had interests. Id.

[¶6]    After Tesoro obtained this new right-of-way from the MHA Nation, Tesoro began negotiating with individual allottees for renewed rights-of-way on the individual allotted tracts. Id. at ¶ 50. Tesoro's first mailed an offer to the approximately 450 individual allottees of $66,000 per acre, which included an initial payment for past use and first year bonus, as well as an annual amount for the remainder of the term. Id. The fair market value per acre for purchase of the land, itself, ranged from $650 to $750 in 2014 and $850 to $900 in 2016. Id. Negotiations with individual allottees were progressing. Id.

[¶7]    By early 2018, Tesoro received consent from approximately 150 individual allottees— enough to give Tesoro eight additional tracts to those included in the 2017 agreement with the Tribe. Id. at ¶ 51. Around the same time, the Superintendent for the BIA's Fort Berthold Agency

asked Tesoro to get a third appraisal at the direction of OST. Id. On March 23, 2018, Tesoro filed its application with the BIA for the right-of-way on the individual allotted tracts with the understanding by the Superintendent that the right-of-way would be approved in completed segments as majority consent is obtained for each tract. Id.

[¶8]	Tesoro submitted its third appraisal on May 31, 2018. Id. at ¶ 52. However, OST required Tesoro to make revisions, which were ultimately re-submitted in August 2018. Id. Despite this, the BIA again failed to secure OST review or obtain approval for the appraisals. Id. On October 31, 2018, Tesoro received notice the OST had merged into the Appraisal and Valuation Services Office ("AVSO"). Id. at ¶ 59. As a result, Tesoro was notified the appraisals would need to be revised again to comply with an AVSO-approved Statement of Work. Doc. Id.

[¶9]	In January of 2019, the AVSO proposed to the BIA Regional Office and the Fort Berthold Office that it could use a recent market analysis of the Reservation to decide whether Tesoro's offer to the individual allottees satisfied the regulatory requirement that it met or exceeded fair market value. Id. at ¶ 60. Tesoro offered $66,000 per acre, which exceeded the $3,997.40 per acre found by the market analysis. Id. AVSO even concluded the market analysis "would certainly provide a sufficient basis for the Superintendent to conclude" Tesoro's offer significantly exceeded the market value. Id. AVSO's Director then issued a Statement of Work for the appraisals on all 44 tracts of land. Id. at ¶ 61. The Statement of Work required Tesoro to obtain a fifth appraisal of the disputed land. Id. at ¶ 62. On February 5, 2020, AVSO confirmed the appraiser would complete the appraisals on all 44 using the same methodology AVSO's review appraiser approved. Id. The fifth appraisal was submitted to AVSO on May 19, 2020. Id.

[¶10]	Despite this, Tesoro was informed AVSO would not provide the appraisals to the BIA without the BIA first instructing it to do so. Id. at ¶ 63. Over the following months, Tesoro

attempted to speak with the BIA's Superintendent and Regional Director and AVSO about the issue, but the BIA "refused to take receipt of the completed appraisals from AVSO." Id.

[¶11] Tesoro continued to engage in good faith negotiations with landowners, increasing its offer from $66,000 per acre to over $70,000 per acre in June 2020. Id. at ¶ 72. At the same time, AVSO provided BIA with another market analysis, explaining it was an alternative to the appraisals BIA refused to accept. Id. The market analysis examined 56 other underground pipeline right-of-way transactions on the Reservation over the previous decade. Id. at ¶ 73. This market analysis showed the per acre range to be between $3,500 and $31,200. Id. Tesoro's offer of over $70,000 was still double the high end of the market analysis. See id.

[¶12] While all of this occurred, the Superintendent was instructing AVSO to stop working on the appraisals Tesoro diligently obtained. Id. at ¶ 66. Instead, "the BIA Superintendent and her staff were secretly working with counsel who represented certain Indian landowners to draft a notice of trespass determination." Id. The secretly-prepared notice of trespass was issued to Tesoro on July 2, 2020 ("July 2 Notification"). Id. at ¶ 75. The July 2 Notification relied only on materials provided to the BIA by allottees' counsel, including "valuation materials, the primary portions which had been prepared by an individual that was not even a certified appraiser." Id. at ¶¶ 66, 75. The individual allottees were allegedly not provided the AVSO appraisal. Id. at ¶ 75. The July 2 Notification effectively derailed the ongoing negotiations. Id. at ¶ 76.

[¶13] Tesoro appealed the July 2 Notification to the Interior Board of Indian Appeals ("IBIA"). Id. at ¶ 77. The Assistant Secretary – Indian Affairs ("AS-IA") assumed jurisdiction over the appeal on August 13, 2020. Id. On October 29, 2020, the AS-IA issued a decision ("2020 AS-IA Decision") to vacate the July 2 Notification in its entirety, citing numerous deficiencies and errors

in the July 2 Notification. Id. at ¶ 78. The AS-IA then remanded the case back to the Regional Director with instructions to issue a new decision. Id.

[¶14]   Tesoro attempted to communicate with the Regional Director after the AS-IA issued her decision and during the remand process. Id. at ¶ 79. Tesoro also attempted to contact the AS-IA on October 30, 2020, November 6, 2020, and November 12, 2020. Id. at ¶¶ 79-82. According to Tesoro, it communicated to the Regional Director its status on negotiations with landowners, including its increased offer of $102,000 per acre. Id. at ¶ 82, 83. The BIA Regional Director continued to ignore Tesoro's attempts to discuss the matter. See id. at ¶¶ 79-81.

[¶15]   Eventually, the Regional Director responded on November 16, 2020 by letter send via mail service. Id. at ¶ 82. Tesoro received the response on November 23, 2020. Id. Tesoro replied to the Regional Director's letter noting Tesoro had increased the offer to $102,000 per acre. Id. at ¶ 83. Mediation between Tesoro and certain allottees occurred on December 2 and 8, 2020. Id. at ¶ 84. Ultimately, on December 11, 2020, Tesoro upped its offer to $110,000 per acre. Id. at ¶ 87.

[¶16]   Despite the good faith negotiations, the Regional Director issued another Notification of trespass on December 15, 2020 ("December 15 Notification"), which required Tesoro to pay $3,961,907.00 for back rent or unauthorized use payments plus interest and to cease using the pipeline. Id. at ¶¶ 88, 89. The December 15 Notification gave Tesoro thirty (30) days to make its payment and stop using the pipeline. Id. at ¶ 90.

[¶17]   Tesoro immediately began compliance with the December 15 Notification. Id. at ¶ 91. Tesoro turned off the flow of the pipeline within forty-eight (48) hours of receipt of the December 15 Notification. Id. at ¶ 92. Tesoro also made a timely payment in full, and the BIA cashed the payment check. Id. at ¶ 93.

[¶18]   Tesoro and certain Allottees appealed, and the AS-IA assumed jurisdiction over Tesoro's appeal on January 13, 2021. Id. at ¶¶ 94-97. The next day, the AS-IA issued her opinion affirming the December 15 Notification. Id. at ¶ 98. The AS-IA's decision stated, "[t]his decision constitutes a final agency action under 5 U.S.C. 704, which is judicially reviewable." Id. at ¶ 100. The AS-IA did not assume jurisdiction over the Allottees' appeals, so the IBIA retained jurisdiction over the Allottees' appeals. Id. at ¶ 101. The IBIA dismissed the Allottees' appeals on February 9, 2021. Id. at ¶ 102. Certain Allottees petitioned to rescind the January 14, 2021, AS-IA decision and requested attorneys' fees. Id. at ¶¶ 103, 104.  This petition was denied on March 3, 2021. Id. at ¶ 105.[3]

[¶19]   In the meantime, the Acting Secretary of Interior mailed Tesoro the Vacatur Order. Id. at ¶ 109. This Decision was signed March 12, 2021, but the attached certificate of service states it was served on Tesoro on March 18, 2021. Doc. No. 1-5, pp. 5-6. In between the Acting Secretary signing the Vacatur Order and it being served on Tesoro, the new Secretary of Interior took office on March 15, 2021.  Doc. No. 1. ¶ 108. The Vacatur Order purportedly vacated the July 2 and December 15 Notifications as well as the 2021 AS-IA Decision. Id. at ¶ 110. The Acting Secretary remanded to the Regional Director for further consideration and to account for Tesoro's continued occupation of the right-of-way. Id. The Acting Secretary did not provide any notice to the Parties of the Acting Secretary's intent to reconsider the prior decisions. Id. at ¶ 113.

[¶20]   Tesoro filed the instant lawsuit on April 23, 2021. Doc. No. 1. Tesoro asserts (1) it is entitled to a declaratory judgment finding the decisions prior to the Vacatur Order are final and Tesoro has fully complied with their requirements (Id. at ¶¶ 128-144); (2) the Acting Secretary's Vacatur Order violates the Administrative Procedure Act (Id. at ¶¶ 145-170); (3) the Acting

---

[3] These allottees ultimately filed a lawsuit challenging this decision. Doc. No. 1, ¶¶ 106, 107.

Secretary's decision violates Tesoro's Fifth Amendment Due Process rights (Id. at ¶¶ 171-185); and (4) a Freedom of Information Act violation (Id. at ¶¶ 186-192). The primary question before the Court is whether the Acting Secretary had authority to vacate the July 2 and December 15 Notifications and the 2021 AS-IA decision affirming the December 15 Notification.

## DISCUSSION

### I.      Preliminary Injunction

#### 1.      Preliminary Injunction Standard

[¶21]   In deciding whether to issue a preliminary injunction, the Court considers four distinct factors: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc). Central to this analysis "is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." Id. "[N]o single factor is determinative," but the probability of success on the merits "is the most significant" factor. Id.; Home Instead, Inc. v. Florance, 721 F.3d 494, 497 (8th Cir. 2013). Regardless, the Court is required to consider all four of the Dataphase factors. See Home Instead, Inc., 721 F.3d at 500.

[¶22]   Tesoro argues a preliminary injunction is appropriate because it satisfies each of the Dataphase factors. Tesoro specifically contends it is likely to succeed on the merits because (1) the Vacatur Order was issued by the previous Acting Secretary three days after the actual Secretary was appointed; (2) there was no notice the secretary assumed jurisdiction or was reviewing the BIA's decisions; (3) the Vacatur Order was not done in a reasonable time; (4) the Vacatur Order was arbitrary and capricious; (5) the Vacatur Order did not properly explain the reasoning or

justification for its conclusions; and (6) the Defendants deprived Tesoro of finality and its protected property interests without due process of law. Tesoro argues it faces irreparable harm because it will be deprived of finality. According to Tesoro, this harm outweighs any injury to the United States because the United States will suffer no harm if the Vacatur Order is enjoined. Finally, Tesoro contends the public interest favors an injunction because the public is served by prohibiting agencies from unilaterally vacating prior decisions marked "final agency action" when the governing statutes and regulations do not provide for such reconsideration. In other words, the public has a strong interest in finality under the circumstances of this case.

[¶23]   The United States argues Tesoro is not likely to prevail on the merits because: (1) the Acting Secretary acted validly by issuing the Vacatur Order; (2) the agency was well within its authority to reconsider its own decision; (3) no statute or regulation prohibit the reconsideration at issue; (4) the Vacatur Order itself was the notice of reconsideration; (5) reconsideration was done in a timely fashion; (6) the Vacatur Order was not arbitrary and capricious; and (7) the Vacatur Order does not violate Tesoro's Due Process rights. The United States further argues Tesoro has not suffered an irreparable injury because ultimately Tesoro's harm is in the form of loss of money, which is not irreparable. Finally, the United States argues the public interest and balance of harms weigh against an injunction because the Acting Secretary is required to ensure all are afforded due process.

### 2. Probability of Success on the Merits

[¶24]   When determining the probable success on the merits of the claims, the Court should not "apply the probability language with mathematical precision." Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc., 815 F.2d 500, 503 (8th Cir. 1987). The Court must "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant

that justice requires the court to intervene to preserve the status quo until the merits are determined." Id. (internal quotation marks and citation omitted).

[¶25]   The Eighth Circuit has described the probability of success on the merits "as the most important of the four [Dataphase] factors." Jet Midwest International Co. v. Jet Midwest Group, LLC, 953 F.3d 1041, 1044 (8th Cir. 2020) (alteration in original) (quoting Roudachevski v. All-Am. Care Centers, Inc., 648 F.3d 701, 706 (8th Cir. 2011)). In weighing this factor, the Court does not decide whether the movant "will ultimately win"; rather, the movant "must simply show a 'fair chance of prevailing.'" Id. (quoting PCTV Gold, Inc. v. SpeedNet, LLC, 508 F.3d 1137, 1142 (8th Cir. 2007) and Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)). Whether a movant has shown a fair chance of prevailing does not mean the movant must "prove greater than fifty per cent likelihood that [it] will prevail on the merits." Id. (quotation marks omitted) (quoting Dataphase Sys., 940 F.2d at 113). Under circumstances where the movant has no chance of succeeding, an injunction will not issue. Id. (quoting Mid-Am. Real Estate Co. v. Iowa Realty Co., 406 F.3d 969, 972 (8th Cir. 2005)).

[¶26]   A movant does not need to show a likelihood of success on the merits of every claim; rather, a movant must establish a likelihood of success on the merits of a single claim. See Nokota Horse Conservancy, Inc. v. Bernhardt, 666 F.Supp.2d 1073, 1080 (D.N.D. 2009) ("The Court finds at this preliminary stage of the litigation, and based on the limited information in the record, the Conservancy has established a sufficient likelihood of success on the merits of its trademark infringement claim. The Court finds it is unnecessary to undertake an extensive review of the Conservancy's additional claims."); Running Horse, LLC v. Rodenbough Trucking & Excavating, Inc., 2016 WL 8737867, *3 (D.N.D. February 26, 2016) ("A likelihood of success on the merits of even one claim can be sufficient to satisfy the 'likelihood of success' Dataphase factor.").

[¶27]   Tesoro has shown a likelihood of success on the merits of its claim the Vacatur Order violated the APA.[4] Agencies have equitable authority to consider its wrong decisions. <u>Iowa Power and Light Co. v. United States</u>, 712 F.2d 1292, 1297 (8th Cir. 1983) (quoting <u>United Gas Improvement Co. v. Callery Properties, Inc.</u>, 382 U.S. 223, 229 (1965) ("An agency, like a court, can undo what is wrongfully done by virtue of its order.")). Despite this inherent authority, "an agency may undertake such reconsideration only if it does so within a reasonable time period and affords the claimant proper notice of its intent to reconsider the decision." <u>Dun & Bradstreet Corp. Found. v. U.S. Postal Serv.</u>, 946 F.2d 189, 193 (2d Cir. 1991).

[¶28]   In addition, Title 43, Section 4.5(a)(2) of the Code of Federal Regulations confers on the Secretary of the Interior "[t]he authority to review any decision of any employee or employees of the Department, including any administrative law judge or board of the Office, or to direct any such employee or employees to reconsider a decision." 43 C.F.R. § 4.5(a)(2). This Section requires the Secretary or Director to provide the parties written notice of the Secretary's or Director's assumption of jurisdiction to review the previous decisions. 43 C.F.R. § 4.5(c) ("If the Secretary or Director assumes jurisdiction of a case or reviews a decision, the parties and the appropriate Departmental personnel will be advised in writing of such action, the administrative record will be requested, and, after the review process is completed, a written decision will be issued."). Tesoro is likely to succeed because the Vacatur Order was issued without any notice to the parties of the

---

[4] The Court takes no position on the issue of whether the Acting Secretary issued the Vacatur Order without due authority. The Vacatur Decision was dated March 12, 2021, while the Acting Secretary was still leading the Department of the Interior. However, it was not mailed until March 18, 2021, three days after the Secretary was confirmed. Neither side provides caselaw or statutes to assist the Court in determining when the decision became effective. Regardless, because Tersoro is likely to succeed on the merits of its APA claim, this issue does not need to be resolved at this time.

Acting Secretary's intent to reconsider the decision and, while only months, under the circumstances Tesoro is likely to show the timeframe was unreasonable.

[¶29] Beginning with the notice, the United States argues the Acting Secretary's Vacatur Order was the notice itself. This betrays reality. The Acting Secretary's order vacated all prior agency decisions relating to Tesoro's pipeline. Without proper notice, Tesoro was not given an opportunity to waive or respond to the claim of prior due process issues. However, the Acting Secretary unilaterally vacated all prior orders and mandated the process start over without input from any party. Contrary to the United States' position, this action was not providing Tesoro the requisite notice of the Acting Secretary's intent to vacate the prior orders. Rather, the order vacated all prior orders without providing Tesoro the opportunity to respond before the vacatur took effect.[5] This is contrary to both the Acting Secretary's inherent authority and the authority under 43 C.F.R. § 4.5. Tesoro is likely to succeed on the merits of this claim.

[¶30] When looking to the reasonableness of the timeframe, courts look to certain factors: (1) complexity of the decision; (2) any express time limit for appeals; (3) legally cognizable property interests from the initial decision; (3) whether plaintiff has relied on the initial decision; (4) whether the agency's justification was merely a pretext of fraud; and (5) impact of a wrong decision without reconsideration. Belville Min. Co. v. United States, 999 F.2d 989, 1001 (6th Cir.

---

[5] The lack of notice likewise undercuts the United States' position that the Acting Secretary had due process concerns over the prior proceedings. There was no notice or opportunity to respond provided to Tesoro before the Acting Secretary vacated the prior orders. Given this lack of notice and an opportunity for Tesoro to respond, it appears the Acting Secretary may have pretextual reasons for summarily vacating all the prior orders. The record, however, does not provide any context for a pretextual justification. Suffice it to say, a lack of due process in the prior proceedings seems a squirrely justification for an order that itself lacked the requisite notice and opportunity to respond.

1993).⁶ When the reasonable timeframe has passed, the agency "'no longer [has] an opportunity to correct the procedural error retroactively.'" Id. (quoting Gratehouse v. United States, 512 F.2d 1104, 1109 (Ct. Cl. 1975)).

[¶31]   On balance, Tesoro is likely to succeed in showing the timeframe for issuing the Vacatur Order was unreasonable. The AS-IA issued the decision to affirm the December 15 Notification on January 14, 2021. The Acting Secretary's Vacatur Order was signed on March 12, 2021, or fifty-seven (57) days after the AS-IA's affirmance of the December 15 Notification. While the timeframe is not necessarily significant in terms of duration, on balance of the factors, Tesoro is likely to show it was unreasonable under the circumstances because of how quickly the prior decisions were made and Tesoro's immediate reliance on the decisions.

[¶32]   While the underlying claims may have significant complexity, the decision itself is relatively straightforward. The Acting Secretary concluded there were unaddressed due process concerns in the prior decision that warranted vacatur. The prior decisions affected Tesoro's property rights because it had already paid the fine and has vacated use of the pipeline. By vacating the pipeline and paying the fine, Tesoro has demonstrated it has relied on the prior decisions. The current record is inconclusive on whether the Acting Secretary's reasons were merely pretextual. Finally, the impact of a wrong decision without reconsideration is minimal because the Acting Secretary did not find any substantive error in the prior decisions. Rather, the Acting Secretary only found there were vague due process concerns that went unaddressed.

---

⁶ The Eighth Circuit has not expressly adopted the factors to consider a claim for untimeliness set forth by the Sixth Circuit in Belville. See Coteau Props. Co. v. Dep't of Interior, 53 F.3d 1466, 1478-1479 (8th Cir. 1995). In Coteau, the Eighth Circuit found Belville to be inapplicable under the circumstances but that the administrative decision was nevertheless arbitrary. Id. at 1479. The Court concludes the factors announced by the Sixth Circuit in Belville are helpful here in determining the timeliness of the Vacatur Order.

[¶33]    In total, Tesoro is likely to succeed in showing the Defendants violated the APA and improperly issued the Vacatur Order. Because Tesoro has shown the Vacatur Order was made without notice and in an unreasonable time under the circumstances, the Court does not consider the remaining arguments at this time. See See Nokota Horse Conservancy, Inc. v. Bernhardt, 666 F.Supp.2d 1073, 1080 (D.N.D. 2009) ("The Court finds at this preliminary stage of the litigation, and based on the limited information in the record, the Conservancy has established a sufficient likelihood of success on the merits of its trademark infringement claim. The Court finds it is unnecessary to undertake an extensive review of the Conservancy's additional claims."); Running Horse, LLC v. Rodenbough Trucking & Excavating, Inc., 2016 WL 8737867, *3 (D.N.D. February 26, 2016) ("A likelihood of success on the merits of even one claim can be sufficient to satisfy the 'likelihood of success' Dataphase factor.").

[¶34]    Tesoro is also likely to succeed in showing the decision to vacate the prior orders was arbitrary and capricious. The Supreme Court has defined the standard for a claim for arbitrary and capricious review of an agency action:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

[¶35]    The Court finds Coteau Properties Co. v. Dep't of Interior helpful in this case. In Coteau, the Eighth Circuit reviewed a "final agency decision by the Office of Surface Mining, Reclamation and Enforcement (OSM)." 53 F.3d 1466, 1477-79 (8th Cir. 1995). The plaintiff was a mining company that held permits granted by the North Dakota Public Service Commission ("PSC"), which in turn was given authority by the federal government to issue certain permits. Id. Coteau

had business dealings with a local power coop and its subsidiaries. Id.  Ultimately, certain miners filed a "citizen's complaint" alleging Coteau did not hold a proper permit required by federal and state law. Id. Additionally, the "citizen's complaint" alleged Coteau did not disclose it was owned by the electric coop. OSM gave the PSC 10 days to investigate. Id. Ultimately, the PSC determined Coteau was not owned or controlled by Basin. Id. OSM did not respond until approximately three months later when a chief of OSM reached the opposite conclusion from the PSC. Id. The very next day, however, OSM's director concluded the PSC was correct that Coteau was not owned or controlled by the coop. Id. This decision was subsequently reaffirmed on January 19, 1993.

[¶36]   Only six days after the reaffirmation, the presidential administration changed. Id. An acting director of OSM was appointed and withdrew the decision and reopened investigations. Id. Approximately seven months later, on August 18, 1993, the acting director of OSM concluded Coteau was owned/controlled by Basin. Id. Coteau sought immediate judicial review rather than pursue agency review process. Id. The district court dismissed the claim, finding the agency did not act arbitrarily or capriciously. Id.

[¶37]   The Eighth Circuit concluded the decision to withdraw and reverse the prior decision was arbitrary because (1) "there was no smoking gun in the record that the previous director could have overlooked" and "the previous director had considered and had based his determination on the relevant record"; (2) the new administration did not apply the "deferential standard of review mandated by OSM's own regulations"; and (3) the previous director's recusal after issuing the determination, without more, did "not provide reason for invalidating a previous determination." Id. at 1478.

[¶38]   This case is similar to Coteau. There is no smoking gun that the Acting Secretary found to summarily reverse the prior decisions. In issuing the Vacatur Order, the Acting Secretary only

pointed to vague assertions of due process concerns raised by the parties. The decision to vacate the prior decisions was likewise made without warning or notice to the parties to object or provide any rationale contrary to the new administration's decision to vacate a decision under the prior presidential administration. And Tesoro immediately relied on the prior orders by vacating the pipeline and paying the fine. Once the fine was paid, the BIA cashed the check, confirming the finality of the decision. As has been clarified by the United States Claims Court, "[i]f the parties act on the initial decision, however, and if the agency knows they will act, then the agency may reverse its initial decision only upon a showing that it was erroneous." McAllister v. United States, 3 Cl. Ct. 394, 398 (1983). The Vacatur Order did not establish the prior decisions were substantively erroneous. It merely stated there may have been due process concerns.

[¶39] Putting all of this together, the Court finds Tesoro is likely to succeed in showing the Vacatur Order was arbitrary and capricious.

### 3. Threat of Irreparable Harm

[¶40] The purpose of injunctive relief is to provide a remedy for an irreparable harm that has inadequate legal remedies. Celco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987). "When there is an adequate remedy at law, a preliminary injunction is not appropriate." Watkins Inc., 346 F.2d at 844. In other words, "[i]rreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." General Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 319 (8th Cir. 2009). "[P]otential loss of consumer goodwill qualifies as irreparable harm." Iowa Utilities Bd. V. F.C.C., 109 F.3d 418, 426 (8th Cir. 1996). Courts can presume irreparable harm if the movant has established a probability of success on the merits of their claim. See Calvin Klein, 815 F.2d at 505 ("The court correctly noted that it could presume irreparable injury from a finding of probable

success in proving likelihood of confusion." (citing Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc., 633 F.2d 746, 753 (8th Cir. 1980))); see also Kodiak Oil & Gas Inc. v. Burr, 303 F.Supp.3d 964, 984 (D.N.D. 2018) ("The Eighth Circuit Court of Appeals has explained that a district court can presume irreparable harm if the movant has a likelihood of success on the merits.").

[¶41]   Tesoro has shown it will suffer irreparable harm if the Vacatur Order and remand for further proceedings is allowed to continue during the pendency of this litigation. Without Court intervention, the issues raised by Tesoro could not be considered in the administrative context. The process would simply restart without review by this Court. There is no remedy besides Court intervention that allows Tesoro further appealed the Vacatur Order to have it rescinded. Absent the injunction, Tesoro will be required to redo all the previous administrative proceedings while at the same time pursue its administrative appeal of the Vacatur Order in this Court.  In other words, there is no adequate remedy at law under the circumstances. General Motors, 563 F.3d at 319 ("Irreparable harm occurs when a party has no adequate remedy at law.").

[¶42]   Accordingly, Tesoro has shown it will suffer irreparable harm absent a preliminary injunction.

### 4. Balance of Harms

[¶43]   "Once the court has determined that there is a threat of irreparable harm to the moving party, it must balance this harm with any injury an injunction would inflict on other interested parties." Richland/Wilkin Joint Powers Authority v. United States Army Corps of Engineers, 826 F.3d 1030, 1039 (8th Cir. 2016).

[¶44]   The balance of harms favors Tesoro. A preliminary injunction at this stage will have little impact on the Defendants. Whereas without a preliminary injunction, Tesoro would be forced to repeat its already-repetitive analysis of the costs associated with the pipeline. Finality is important

to Tesoro. The Vacatur Order was issued without notice and in a timeframe that is likely unreasonable under the circumstances. Pausing the Vacatur Order during the pendency of this litigation will provide an opportunity to review the Vacatur Order in light of the entire record. The harm to the Agency is minimal whereas the harm to Tesoro is apparent and the level of uncertainty is significant and unacceptable. Because of this, the balance of harms leans in favor of Tesoro.

### 5. Public Interest

[¶45]   "For the court to grant an injunction, the moving party must establish that the entry of the relief would serve public interest." North Dakota v. E.P.A., 127 F.Supp.3d 1047, 1059 (D.N.D. 2015) (citing Dataphase, 640 F.2d at 113).

[¶46]   The public interest favors Tesoro. The public has a strong interest in final agency decisions actually being final. It would be administrative chaos to allow an agency to unilaterally reopen decided matters without providing the required notice to the parties as has happened here. While the Court appreciates the Defendant's stance that the public interest dictates an injunction would disrupt an orderly discharge of the Agencies' duties, the Agency itself appears to carry the blame here. The Acting Secretary unilaterally vacated the prior orders without notice to Tesoro. This appears to be a roughshod performance of the Agencies' operations. The public interest favors an injunction of the Vacatur Order and subsequent administrative proceedings.

## II.   Motion to Intervene

[¶47]   Also before the Court is a Motion to Intervene. The Court previously denied many of the currently proposed intervenors' request. Doc. No. 67. The proposed intervenors claim the July 2022 proposed settlement agreement shows the United States does not adequately represent their interests. This motion is simply a second attempt to intervene—albeit it with several additional

proposed intervenors—after having been previously denied. Nothing in the present Motion to Intervene changes the Court's prior conclusions.

[¶48]   Intervention as a matter of right is inappropriate because the United States continues to adequately represent the proposed intervenors' interest in this case.[7] See Doc. No. 67, ¶¶ 7-14. As for permissive intervention, the case would be substantially expanded and further delay of the preliminary injunction decision would likely occur. See id. at ¶ 19. The Court remains unconvinced intervention will streamline the judicial proceedings.[8] See id. at ¶ 20. The July 2022 proposed settlement agreement is not a new fact requiring reconsideration. Nor is the Court's previous order bifurcating this case and staying the trespass claim until final resolution of the administrative issues a significant change. In fact, the Court previously noted any claim for trespass by allottees "lacks a common question of law with the main action." Id. at ¶ 18. In short, the Court adopts its prior reasoning (Doc. No. 67) in full here. The Motion to Intervene is, therefore, again **DENIED**.

## CONCLUSION

[¶49]   On balance, the Dataphase factors favor preserving the status quo while the legal issues are fully considered by this Court. See Dataphase, 640 F.2d at 113 (noting the Court should look first to "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined"). Accordingly, and for the reasons articulated above, Tesoro's Motion for Preliminary Injunction is **GRANTED**. The administrative proceedings ordered by the Vacatur Order are hereby **ENJOINED** from further process until such time as this Court resolves the administrative issues in this case.

---

[7] As for Allottee's breach of trust claim, all parties agree the Federal Court of Claims has jurisdiction over that claim.
[8] In fact, as Tesoro argues, permitting the motion to intervene at this stage would likely cause further delay of the Court's consideration of Tesoro's Motion for Preliminary Injunction.

[¶50]   In addition, for the reasons set forth above and in the Court's prior Order, the Intervenor's Motion to Intervene is **DENIED**.

[¶51]   **IT IS SO ORDERED**.

DATED July 10, 2024.

Daniel M. Traynor, District Judge
United States District Court